**WHITE-ALLEN CHEVROLET, INC v AUTO MECHANICS' LOCAL UNION NO. 314 et**

Ohio Common Pleas, Montgomery Co

Decided August 10, 1938

Pickrel, Schaeffer, Harshman, Young and Ebeling. Dayton, for plaintiff.

Scharrer, Scharrer, McCarthy & Hanaghan, Dayton, for defendants.

## OPINION

By CAMERON, J.

While the above entitled cause is pending before this court only upon a motion for a temporary injunction, yet it was presented to the court with such thoroughness, both as to evidence and presentation of legal authorities, that the court feels called upon to render an opinion setting forth, as carefully as possible, the reasons for its conclusion in the matter.

As the court has already said, the evidence presented raised little dispute as to the facts, which are important for its consideration in determining this matter, and the questions of law, therefore, become exceedingly well defined.

However, before discussing the legal phases of the matter it seems important to set forth at some length the exact situation of the parties to this action.

The plaintiff, the White-Allen Chevrolet, Inc., is a corporation organized under the laws of Ohio with its principal place of business at 442 and 449 North Main Street, Dayton, Ohio, and is engaged in the business of selling Chevrolet automobiles and trucks and used cars of all makes, and also of repairing and servicing cars and trucks. It employs in its service department about seventeen employees as mechanics, who, because of the nature of their occupation, would, if they so desired, be eligible to membership in Auto Mechanics' Local Union No. 314, International Association of Machinists.

The defendant Auto Mechanics' Local Union No. 314, International Association of Machinists, is an unincorporated association of auto mechanics, affiliated with The American Federation of Labor, and with a membership of approximately ninety in the city of Dayton, Ohio. The defendant, John Loudon, is its business agent as well as being the business agent for five other similar organizations.

The defendant, The Labor Union, Inc., is the publisher of a weekly newspaper at Dayton, Ohio, representing organized labor through The Central Labor Union and affiliated with the The American Federation of Labor.

The defendant, S. F. Wherley, is the financial secretary of Auto Mechanics' Local Union No. 314, and the defendant, Esta Booher, is a member of the union, and was at one time its president, although the court is of the impression that he testified that he was not now president of the union, and no evidence was given disclosing to the court who now held that position.

Upon Saturday, the 9th day of April, 1938, Auto Mechanics' Local Union No. 314 established picketing of the plaintiff's place of business located on North Main and McPherson streets in the city of Dayton, Ohio, by placing men with banners upon the sidewalks adjacent to the property of the plaintiff who walked back and forth carrying the banners, (which varied in number from one to four) almost continuously during the daytime and evening. These banners contained the following statement:

"To Members and Friends of Organized Labor: White-Allen Chevrolet, Inc., unfair. Do not patronize.

"Auto Mechanics' Local No. 314, I. A. of M., Dayton Building Trades Council, Dayton Metal Trades Council, Central Labor Union."

and bearing the initials of "A. F. of L." upon said banners in five different places, and also causing to be distributed to passersby upon the sidewalk copies of the paper "The Labor Union," containing articles concerning the plaintiff company, and especially concerning its president, Hugh White. There is also evidence that these papers were distributed in automobiles, which came to a stop for the stop-light located at the corner of Main and McPherson streets.

As a part of said picketing, the numbers upon the automobiles and trucks of persons patronizing the plaintiff company were in some instances taken, and the owners of the motor vehicles later called by telephone concerning their patronizing this company.

There was some evidence as to distribution of upholstery tacks in the driveway of the plaintiff company, but no evidence connecting this with the pickets of the defendants in any manner, except that the same occurred while the picketing was in progress.

There was also slight additional evidence, not convincing to the court, of a threat to one customer and of the swinging of a ban-

ner in the face of another customer of the plaintiff company.

The court, however, finds there has been a failure of any proof as to violence upon the part of the pickets established, and, therefore, finds that the picketing in this case would come under the definition, "peaceful picketing," subject, however, to the court's discussion hereafter upon the nature of the articles contained in the newspaper, the Labor Union, which were distributed during the time of the picketing.

The White-Allen Company was established in the city of Dayton, Ohio, some years ago, and has built up a prosperous and extensive line of business at its present location. It seems to the court well proven that the picketing upon the part of the defendants has caused a loss in this business of from thirty to forty per cent, and, as the employees of the plaintiff company work upon what is known as a "flat-rate basis," this loss extends to the employees as well as the employer. This "flat-rate basis" will be hereafter more fully described.

There was in the proof no evidence that the management of the White-Allen Chevrolet, Inc., had at any time taken a stand against union labor, or that their employees were required to be either union members or non-union workmen, unless such proof might be found in the conflicting statements as to the occurrence between John Loudon, the business agent of the defendant union, and Hugh White, the president of the plaintiff company, which took place upon the 8th day of April, 1938, the day preceeding the establishing of picketing in this case. The court does not feel called upon to determine the merits of this controversy, especially as the members of the local union testified that the picketing of the plaintiff company had been determined upon prior to that date, and the only effect of that occurrence, if any it had, was to cause the picketing to be established upon the following day.

The evidence clearly discloses that James A. Dunham, who has been service manager for the plaintiff company since February of 1935, and who was largely responsible for the employment and discharge of its workers, did not ask prospective employees whether or not they were members of a labor union, and that the management of the company at all times signified to its employees that it was entirely within their province to determine whether they would become members of the union or not. and the management stood ready to deal with them through any agency, which they might themselves choose.

It is in evidence undisputed that in the year 1935 a contract was entered into between the plaintiff company and the defendant, Local Union No. 314, fixing certain minimum rates per hour for employees of the plaintiff company, a copy of which contract is in evidence as Defendant' Exhibit "C," and which contract became effective February 15, 1935, and expired February 1, 1936. This contract was not what is known as a "closed-shop contract," but left the plaintiff free to employ either union or non-union labor so long as it maintained the minimum rate of pay set forth in the contract; and observed the minimum and maximum hours of work per week for its employees. After this contract expired on February 1, 1936, it was not renewed, and there has since been no existing contract between the plaintiff and the defendant, Local Union No. 314.

The defendant, Local Union No. 314, in seeking contracts with firms engaged in a business similar to that of the plaintiff have always demanded payment of employees upon what is known as a "straight time basis," whereby the rate per hour for first-class, second-class and third-class mechanics, and for body and fender workers and painters and lubrication men, was fixed at a minimum rate, and employees were not to work over forty-four hours nor less than thirty-three hours per week. It was possible, however, under such a contract to discharge the men from employment whenever there was insufficient work for the employees, and to reemploy them at at later date.

The system under which the plaintiff the White-Allen Chevrolet, Inc., had been and now is paying its men, is what is known as a "flat-rate" system, whereby the men were paid forty per cent of the amount charged the customer for the labor performed; the amount charged the customer being fixed by the Chevrolet Automobile Company. Under this plan the earnings of the employe depended upon the labor he performed, and if he reported for work and there was nothing for him to do his earnings were decreased according to the amount of time that he was idle.

There was also paid to the employees of the White-Allen, Chevolet, Inc., a yearly bonus, which they received at the end of the year, and which one witness testified amounted to fifteen per cent.

There is a dispute in the evidence as to whether the method of payment advocated by the union or that adopted by the White-

Allen Chevrolet, Inc., would produce for the laborer the greatest yearly compensation, but there seems to be no such dispute that all of the employees of the plaintiff company consider the "flat-rate" basis, or the payment of forty per cent, as the most profitable to themselves and this is shown by the fact that after entering into the contract under date of February 15, 1935, and only about thirty days from that date all of the employees of the plaintiff company voted for a restitution of the "flat-rate" system of payment. Prior to that time the plaintiff company had been paying weekly the minimum amount guaranteed by the contract with the defendant union, and had been adding thereto at the end of each month any addittional amount that the employee might have earned. If in any event the employee failed to earn the minimum amount during any particular week - then this shortage was deducted from his bonus at the end of the year.

Upon the 8th day of April, 1938, the day preceding the establishment of the picketing in this case, the president of the plaintiff company, Hugh White, through James A Dunham, his service manager, called together his employees and submitted to them a paper, now marked Plaintiff's Exhibit "9," and worded as follows:

"ATTENTION ALL EMPLOYEES CONNECTED WITH THE SERVICE DEPARTMENT, PARTS DEPARTMENT, USED CAR DEPARTMENT, PAINT DEPARTMENT, LUBRICATION DEPARTMENT AND PORTERS AND ALL OTHER DEPARTMENTS THAT REPAIR, LUBRICATE, WASH AND PAINT CARS—ALSO THE SALES DEPARTMENT AND OFFICE DEPARTMENT:—

"I have called a meeting today at which time I would appreciate your signing the attached paper without any fear of loosing your job or in any way intimidating yourself by doing so. I want you to feel free that you are signing it with no stress or obligation nor with any favoritism to me either way, as I am willing to abide by majority vote. Feel perfectly free to vote in this matter as to whether this shop will be run on a union or a non-union basis.

"Now remember, gentlemen, it is entirely up to you and I want you to do this of your own free will. Positively don't be afraid of your Service Manager nor of me or anyone else.

"**Vote your own opinion in this matter.**

"As I have told you at meetings in the past you aren't working for me but with me. It is entirely up to you. I have nothing against the union and I am willing to run a union shop if you want it.

————————

Hugh White"

HW:EW

Two columns of lines for signatures appear below this wording; one saying, "For union sign here:—" the other saying, "If you want to run as an open shop as it now is sign here:—," and at this meeting all of the employees of the plaintiff company signed under the line indicating an "open shop."

Upon the 6th day of July, 1938, after the picketing had been in progress for some three months the employees of the plaintiff company signed another statement, which read as follows:

"WHITE-ALLEN CHEVROLET, INC., DAYTON, OHIO.

We are all of the employees of White-Allen Chevrolet, Inc., mechanics, salesmen and others. Practically all of us have been with you since you started and are satisfied.

We do not belong to Auto Mechanics' Local Union No. 314, A. F. of L. and do not desire to belong. Very few, if any of us, have been even asked to join and will not join.

The picketing, signs, literature, throwing of tacks in driveways, taking license numbers of customers, taking pictures of customers driving into our shop, intimidating our patrons and false advertising in the Labor Union Paper by this union against you and us interfere with our right to work, reducing our income, and places us all in an unfair and false position in this community.

The working arrangements between you and us are satisfactory. There is no dispute concerning hours, wages or working conditions. We can make our own contracts and desire no outside interference.

We have taken up the matter with the National Labor Relations Board, but they tell us there is nothing that they can do.

We ask you to take all legal means to end the unfair and untruthful conduct of the union, which is reducing our income, interferring with our right to work, and we pledge our co-operation."

This statement appears to have been signed by all of the employees of the plaintiff company, and bears the names of sixteen men under the title "Mechanics."

That there is not now and has not been between the plaintiff and its employees any labor dispute is clearly in evidence. The

plaintiff has always allowe' its employees the privilege of presenting any complaint they might have as to wages, working conditions or in any other matter, and the employees have maintained a committee of three of its members to represent them in presentation of such matters to the service manager of the company, and monthly meetings have been held with the management and all of the employees of the company for the purpose of open discussion of its operations.

None of the present employees of the company appear to be members at this time of the defendant, Auto Mechanics' Local Union No. 314, and none of the men belonging to said union, or picketing the plaintiff's place of business were immediately prior to the starting of said picketing employees of the plaintiff company.

It is true that two men, Lowell Hughs and Robert Sigler, who are now members of Auto Mechanics' Local Union No. 314, and who are also participating in the picketing of said plant were at one time employees of the plaintiff company, during which time they were also members of said union, but it does not appear to the court that either of said men were discharged from employment in the plaintiff company by reason of their union membership. It being in evidence that Lowell Hughs was discharged because of improper workmanship, and that Robert Sigler was discharged because he defused to accept a change of employment from daytime until nighttime. The defendant's counsel, however, seem to desire that the court draw the inference that in some way these two men were discharged because of union affiliation, and it may be, therefore, beneficial to review their history as given by themselves upon the witness-stand.

Lowell Hughs came to Dayton, Ohio, in August of 1935, and went to work for the White-Allen Chevrolet, Inc., joining the union in about two weeks after his employment. He continued to work for this company until November 1936, or a period of about one year and three months, when he was discharged for the reason stated. At the time of his discharge the union was informed of the same and took up with the plaintiff company a discussion of the reasons therefor, and seems to have acquiesced finally in the discharge, as no action was taken upon the part of the union at that time. It is worthy of further note that the term of employment of Hughs in the plaintiff company was longer than that of his employment by any other person or com-

pany since he came to Dayton, Ohio. He testified that he had now been out of work five and a half months, and, although a member of the union, he seems to be unable to secure employment as an auto mechanic. In detailing his employment as an auto mechanic since he left the plaintiff company he mentions employment by some five companies or persons for periods varying from two weeks to nine and one-half months, but none longer.

Robert Sigler worked for the plaintiff company from January 2, 1936, until June, 1936, or about six months, and then quit, as he testified, because he did not want to work at night, as his wife objected to his doing such work. He testified that a year was the longest he had ever worked at one place, and that he had worked at four or five places, and, if the courts recollection is correct, testified that he is not now working as an auto mechanic.

The court can, therefore, see no reason for associating the fact that these men quit working for the plaintiff company with their union membership or any conflict upon the part of the plaintiff company and the union.

Additional facts worthy of note before discussing the law applicable to this case are:

That there are at the present time some thirty institutions in the city of Dayton, Ohio, similar to the plaintiff, dealing in new cars and new trucks and servicing and repairing of cars, all of whom employ mechanics eligible to membership in the defendant, local union No. 314 and none of whom at this time have contracts with said union. It is true that at the time the picketing began in this case four of these companies did have what are known as "open shop" contracts with the union, which expired in July of 1938, and which have not since been renewed. One of the four having such contracts has ceased to exist, and it is undisputed in the evidence that there is no such institution having a "closed shop" contract with the Local Union No. 314, or in fact any contract whatsoever.

The Local Union No 314 has a membership of ninety, and their business agent, Mr. Loudon, testified that there were in the city of Dayton, Ohio, 350 to 400 men working as auto mechanics who, because of their employment, could qualify as members of the Auto Mechanics' Local Union No. 314.

It was also in testimony that because of the small membership of the Auto Mechanics' Local Union No. 314 they could not picket all of the places in Dayton, Ohio, and

had determined upon the picketing of but one place a year, selecting the plaintiff company for the first of such places.

As bearing upon the fact of the plaintiff's attitude toward the union it is worthy of note that the plaintiff never in any way interferred with the approach to its employees by members of the union, and especially its business agent, for the purpose of soliciting the membership of such employees in the union, and in fact very few of them had ever been approached with a view to securing such membership, although it is in evidence that the business manager, Mr. Loudon, was permitted in October of 1937 to go through the plaintiff's place of business and distribute cards seeking to bring about a meeting discussing such membership upon the part of the employees.

It is clear to the court, therefore, that there is no labor dispute between the plaintiff and its employees, and that the right to carry on the picketing established on April 9, 1938, and still continuing, if legal, must be based solely upon the defendant's contention that the dispute between the plaintiff and the defendant, Auto Mechanics' Local Union No. 314, creates a labor dispute.

The questions of law involved in the case have been quite fully and completely briefed for the court by the attorneys for the parties, and the court has read with much interest the cases referred to. However, the court does not deem it necessary to review all of the cases cited, but a discussion of a few of them will be deemed sufficient.

The case chiefly relied upon by counsel for the defendant, as sustaining the defendant's position, is the case of **Clark Lunch Company v The Cleveland Waiters' Local No. 106, 22 Oh Ap 265.** This case was tried upon an agreed statement of facts, and it is important to take into consideration the exact activity of the local union in order to determine the exact holding of the court. As far as can be ascertained from the agreed statement of facts there was no picketing in this particular case by way of the carrying of banners back and forth in front of the plaintiff's place of business, but all that was done was the hiring of two persons to hand out and distribute, between the hours of 11 o'clock A. M. and 2:30 o'clock P. M., and 5:30 o'clock P. M. and 8 o'clock P. M., to patrons, prospective patrons and other persons upon the street and sidewalk in front of and about the entrances to the place of business, printed cards, which read as follows:

"S. A. Clark's Restaurant, 1801 East Ninth Street, does not employ union help in dining room and kitchen, and we respectfully ask the public to refrain from patronizing this unfair place."

(Signed) "Joint Executive Board H. & R.E.I.A. and B.I.L. of A."

It further appears from said agreed statement of facts:

"The plaintiff pays its employees less wages and their hours of labor are longer than those usually received and worked by employees in restaurants employing only members of the defendant labor union and organizations.

"That there are in the city of Cleveland large numbers of restaurants and hotels which employ union labor at the terms and under the conditions which the defendant unions requested the plaintiff to engage their employees.

"That there are a large number of restaurants in the city of Cleveland which do not employ labor under union conditions, and which do not pay wages as great as restaurants which employ members of defendant labor unions are required to pay, and which employers require their employees to work longer than union restaurants."

The great difference between the picketing in that case and the picketing in the case at bar becomes apparent not only from the fact already stated as to the carrying of banners by the picketers in the instant case, but also from a consideration of the nature of the literature handed out by the picketers in the case at bar.

The papers shown to the court as having been handed out by the picketers are copies of the paper known as The Labor Union, issues of April 8, April 22, April 29 and May 13, 1938. These papers contain statements vastly different from the mild-mannered statement that the Clark Restaurant did not employ union help in dining room and kitchen. These statements consistently undertook to show that there was a dispute between the company and its employees as well as making an attack upon the character and business integrity of Hugh White, the president of the company.

In the issue of April 8th we find these statements:

"Organized for several years under a verbal agreement, which their employers consistently repudiated, mechanics in the White-Allen shops wanted a signed contract

under which their boss would be unable to chisel.

"Years of experience during which White had broken his word more easiy than he had given it had made his garage employees wary.

"And the picketing will be extended this time until White gives signed proof that this time he will not immediately chisel on the already low wages of those who slave for him in his repair room."

There are many other statements contained in the article distributed in the paper of April 8th, which go beyond any that might be permitted by a peaceful boycott or picketing, but the court has quoted only those which attempt to create an impression upon the part of the general public that there was a dispute between the White-Allen Chevrolet, Inc., and its employees concerning wages and the hours of labor.

The issue of April 22nd contains much that appears to the court objectionable, but it is sufficient for our purpose to quote the last paragraph only, which reads as follows:

"And most of Dayton knows that daily for several weeks a large picket line has been maintained about the White-Allen establishment on North Main street, although the laws of the state and nation prescribe that no picketing can be carried on where there is no labor dispute, so this is further proof that labor trouble does exist at White-Allen's."

It would perhaps serve no good purpose to quote at length from the issues of April 29th and May 13th, but they seem to the court to contain much matter that is objectionable; that continues to creat the impression that there is difficulty between the plaintiff company and its employees, and that makes statements concerning the attitude of the plaintiff company toward the labor union that are not in accord with the proof as offered to the court in this case.

Therefore, the finding as set forth in the Clark Lunch Company case against The Waiters' Local would scarcely be applicable to the case at bar.

A further reason appears when one follows the reasoning contained in the opinion in this case.

It will be recalled that the court inquired of defendant's attorney whether he felt that a union had the right to picket one out of a large group of concerns, who were not under union contract, when, as a matter of fact, there was no concern in the city which was under a union contract, and the picketing simply amountd to the destruction of one company's business, and the sending of that business to other companies who were similarly situated.

On page 272 of the Clark Lunch Company case we find this reasoning.

"On the other hand the defendants by reason of their obligation to competitors who employed union labor, and for the protection of their members, had a legal right in a lawful way to influence and control the patronage of their members and of their friends in favor of themselves, and those with whom they had contracts. The business or patronage is a concrete asset of the defendant's, which they have a legal right to control and use for the benefit of their organizations, the members thereof, and those in business who are under contract to employ union labor."

It seems to the court that if picketing were allowed as against a single company in a situation such as that that now exists in Dayton, Ohio, where that company had no dispute with its employees, it would simply enable the union to destroy the business of one company for the benefit of another similarly situated, and without result to itself or its membership. If but one of the thirty companies is picketed a year, and that is the method sought to be used to secure contracts with the union upon the part of such companies, a general unionization of auto mechanics of Dayton certainly would be a long time in taking place.

The court does not believe, therefore, that the case of the Clark Lunch Company against the Waiters' Local found in 22 Oh Ap 265, has application to the case at bar. Going further the court does not believe that the rule has yet been established in Ohio that picketing is proper in those cases in which there is no trade dispute between the employer and the employees.

The case of Saltzman v Employees' Local, found in 10 OO 6, which was decided by Judge Hurd of the Cuyahoga county Common Pleas Court on November 15, 1937, presents the reasoning in this matter, and on page nine of the opinion adopts the definition of a trade dispute given in the case of Park v Hotel et, Employees, 22 N. P. (N.S.) 257, which definition was pronounced by Judge Foran, one of the ablest judges that

ever occupied the bench in Cuyahoga county. This definition is as follows:

"A trade dispute can only exist or arise where there is a stoppage of work of employees or lockout by the employer, and there is an intention or reasonable expectation upon the part of both the employees and employer to resume the relation of employer and employee upon the satisfaction of certain specified conditions prescribed or agreed to by one or both of the parties to the dispute."

After quoting this definition Judge Hurd says:

"It is quite apparent from a study of this case that this definition was arrived at after an exhaustive study of many authorities on this subject both in England and America. We have reviewed some of these authorities, including those reviewed by the learned judge and decisions of various courts since that time, and are of the opinion that this definition is in consonance with the great weight of authority on the subject."

An excellent treatise upon this matter is also found in the article by W. K. Stanley of Cleveland, Ohio, beginning on page 703 of the Ohio Bar Association Report bearing date of March 21, 1938, wherein he calls attention to the fact that many of the decisions seemingly in conflict with the above view are based upon statutes enacted, which statutes give a broader definition to a labor dispute or trade dispute than that commonly adopted by the courts. He calls attention especially to the Wisconsin statute and to the federal statute known as the Norris-LaGuardia Act, and also calls attention to the fact that in thirty-six states, including Ohio, there are no such statutes.

Because these treatises and cases so thoroughly discuss all authorities upon the subject, the court does not feel called upon to cite further authority.

However, a consideration of the cases has convinced the court that they have largely been decided upon the peculiar circumstances entering into each case, and the court, therefore, feels inclined to summarize the situation of this case as follows:

To refuse an injunction in this case would be to allow Local Union No. 314 to continue to seek to compel all the employees of the plaintiff who are mechanics to become members of Local Union No. 314, even if this were against their will; to compel them to accept a basis and standard of pay that these employees apparently do not consider as beneficial to themselves as the basis or standard under which they are now working, and a basis or standard which they have once rejected by vote, and also to compel them to accept the local union as their bargaining agent though they now have their own committee and method of direct approach to their employers for the presentation of complaints and the making of suggestions as to the betterment of their employment, with which method they are fully satisfied; it would permit Local Union No. 314 to continue to seek by picketing to compel the employer to adopt ▮▮▮▮ a closed shop, and require the employer to compel its employees to become members of the union, whether they so desire or not; it would permit Local Union No. 314 to continue to take the numbers of the cars and trucks entering the plaintiff's place of business and call the owners of the same by telephone calling their attention to the fact that they had patronized a place picketed by the union (as Mr. Loudon himself testified that he called a coal company that employed union teamsters), which conduct the court deems might easily result in intimidation of prospective customers of the plaintiff; it would permit the union through its pickets to continue to pass out, as part of ▮▮▮▮ its picketing, copies of the paper, The Labor Union, containing statements tending to create the false impression on the part of the general public that there was and is trouble between the plaintiff and its employees; it would permit Local Union No. 314 by picketing to continue to reduce the income from the service department of the plaintiff employer by some thirty or forty per cent, and also to cause a like reduction in the wages of those employed in that department; it would permit Local Union No. 314 to continue to drive trade away from one of thirty concerns in a similar business to others which were apparently no more friendly to the union than the place picketed, and while the union had no place of business in the city of Dayton operating on the basis of a contract similar to that which it now demands of the plaintiff.

The court, therefore, feels that a temporary restraining order and injunction should be issued as prayed for in the motion for the same filed by the plaintiff herein.

CAMERON, J, of Union county sitting by designation in Montgomery county.